PETTIBONE CORPORATION,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 93–4027.

United States Court of Appeals,
Seventh Circuit.

Argued June 7, 1994.

Decided Sept. 7, 1994.

Gary R. Allen, Kenneth W. Rosenberg (argued), Dept. of Justice, Tax Div., Appellate Section, Charles J. Cannon, Dept. of Justice Tax Div., Mayer Y. Silber, Dept. of Justice Tax Div., Appellate Section, Washington, DC, for U.S.

Steven P. Handler, Steven F. Pflaum (argued), Nancy M. Hoffman, McDermott, Will & Emery, Chicago, IL, for Pettibone Corp.

Before CUMMINGS, ALARCÓN, * and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

This appeal marks the third time we have addressed issues arising out of Pettibone Corporation's bankruptcy. See *Pettibone Corp. v. Easley*, 935 F.2d 120 (1991); *Moser v. Universal Engineering Corp.*, 11 F.3d 720 (1993). At least one more appeal is pending before another panel. This go-'round presents interesting questions about the interaction of the Internal Revenue Code and the Bankruptcy Code.

The United States is a creditor in Pettibone's reorganization. It filed proofs of claim asserting unsecured priority claims against Pettibone for various pre-petition corporate income and withholding taxes. See 11 U.S.C. § 507(a)(7). Although these claims specified a fixed amount due, they stated that the amount was subject to change because the IRS had yet to complete audits for four of the five tax years immediately preceding the bankruptcy petition. The IRS spent nearly two more years completing the audit. In November 1988 the IRS filed a single amended claim that superseded all prior claims. This final proof of claim alleged that Pettibone had underpaid its taxes by $5,518,116 as of the petition date but was entitled to a refund of $2,132,584 for overpayments during the same period. The IRS asserted a secured claim in the amount of the refund (see 11 U.S.C. § 506) and an unsecured claim for the balance of $3,385,532.

* Hon. Arthur L. Alarcón, of the Ninth Circuit, sitting by designation.

The bankruptcy court allowed the IRS to file this amended claim.

Approximately one month later the bankruptcy court confirmed Pettibone's plan of reorganization. The plan gave Pettibone six years to pay "Unsecured Tax Claims" in the "full amount of such Allowed Claims" plus interest "at such rate as may be approved by the Bankruptcy Court". It did not, however, quantify these "Allowed Claims." Pettibone challenged the methodology of the IRS's tax claims and filed an adversary proceeding seeking a declaratory judgment barring the IRS from using the refunds to offset any underpayments. Pettibone asked the court to direct the IRS to disburse the refunds to it immediately, while waiting six years for payment in the other direction.

Pettibone and the IRS later agreed on the amounts of the tax underpayments and overpayments for each year. They did not agree, however, on the manner in which these sums should be netted or on how interest should be calculated. The IRS argued for continuous netting of overpayments, underpayments, and interest on the balance. The parties stipulated that under that approach Pettibone owed $2,379,189 on the date it filed for bankruptcy. The IRS conceded that it had no right to interest until confirmation of the plan of reorganization. See 11 U.S.C. § 502(b)(2); *In re Fesco Plastics Corp.*, 996 F.2d 152, 155 (7th Cir.1993). A resumption of interest on the confirmation date brought the current total over $3 million. Pettibone responded that continuous netting is a setoff within the meaning of § 553 of the Bankruptcy Code and that its plan of reorganization forbids setoffs. According to Pettibone, if the IRS wanted to use this method it should have ensured that the plan preserved its rights. Because the IRS failed to do so, Pettibone contended, the correct approach is to tally the overpayments and the underpayments separately. Interest also accrues separately, with no interest on Pettibone's debt during the reorganization. Under this approach, the same series of over- and underpayments results in the IRS owing Pettibone $254,054 by the time of trial. Both the bankruptcy court and the district court agreed with the IRS, although for different reasons.

## I

Pettibone agreed to a Chapter 11 reorganization plan that calls for full payment of its tax obligations. See 11 U.S.C. § 1129(a)(9). The plan does not, however, provide the rules to use in determining what these tax obligations are. The IRS conducted an audit of the 13–year period immediately preceding the bankruptcy. The audit revealed that Pettibone had overpaid taxes in some years and underpaid in others. Following its established procedures, the IRS netted these overpayments and underpayments to establish the total tax liability. See 26 U.S.C. § 6402(a). Pettibone does not contend that the netting of these overpayments violated either the Internal Revenue Code or the implementing regulations. Rather it says that by banning setoffs its plan of reorganization bars the IRS from treating its tax obligations in the normal manner.

Did the netting of overpayments against underpayments constitute a setoff? The bankruptcy court said "No." It held that because the debts lack mutuality, see 11 U.S.C. § 553, netting them is not a setoff and hence is not barred by the Bankruptcy Code or the plan. The Internal Revenue Code leaves to the Commissioner's discretion whether to apply overpayments to delinquencies or to refund them to the taxpayer. 26 U.S.C. § 6402(a). Until the Commissioner exercises this discretion, the taxpayer has no right to payment. Because Pettibone lacks similar discretion with respect to its underpayments, the bankruptcy court found that the debts are non-mutual. It concluded from this that the IRS's approach is not a setoff and may be used to determine Pettibone's aggregate tax liability.

This analysis contains a basic flaw. That debts are non-mutual is a reason for *forbidding* a setoff, not a factor in determining whether the cancellation of debts *is* a setoff. There is no doubt, for example, that pre-petition and post-petition debts are non-mutual. *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562, 564 (7th Cir.1986). Under the bankruptcy court's reasoning, a creditor could offset any claim it had against the bankruptcy estate against post-petition

debts it owed the debtor. Yet such a result would be improper. *Id.* at 565; *Braniff Airways, Inc. v. Exxon Co.,* 814 F.2d 1030, 1036 (5th Cir.1987).

The district court disagreed with the bankruptcy court's conclusion on mutuality but agreed that the IRS could perform the offset. The court characterized the netting of tax overpayments against tax underpayments as "an accounting method" and "not the type of 'setoff' or 'offset' contemplated by the Bankruptcy Code." 161 B.R. 960. We agree with this conclusion.

Unless the parties have distinct obligations to each other, the concept of "setoff" makes no sense. By reopening and adjusting each of the tax periods from 1973 through 1986 at the same time, the IRS effectively transformed the 13–year stretch into one accounting period. Nominal "underpayments" and "overpayments" within the audit period were merely intermediate steps in an attempt to determine Pettibone's taxes. Although this audit stated taxes for each year, the calculations spanned many years. Corporate taxpayers file yearly returns, but those returns are in many respects contingent. They are subject to modification when future events with tax consequences for the year in question come to pass. For instance, many of the underpayments and overpayments in the present case resulted from tax loss carrybacks: losses from later years attributed to earlier years for tax purposes. See 26 U.S.C. § 172.

Loss carrybacks exemplify the interdependence among periods within the corporate taxation system and show that from both economic and legal standpoints the nominal one-year accounting period for taxes is deceiving. See Marvin A. Chirelstein, *Federal Income Taxation* § 10.01 (6th ed. 1991); Myron C. Grauer, *The Supreme Court's Approach to Annual and Transactional Accounting for Income Taxes: A Common Law Malfunction in a Statutory System?*, 21 Ga. L.Rev. 329 (1986); *Mazzocchi Bus Co. v. CIR,* 14 F.3d 923, 932 (3d Cir.1994). This interdependence acquires special significance during an audit, when many tax years are open simultaneously. Operating losses shift among the periods, altering tax conse-

quences; an underpayment for one year may reflect nothing more than the movement of a loss from that year to another, simultaneously resulting in an overpayment for the latter year. Treating the calculations within an audit period as setoffs would make sense only if the tax obligation for each year were independent. Interdependence among the periods makes such a characterization inappropriate for corporate taxpayers.

An approach based on strict separation between tax periods may work with natural persons. See, e.g., *United States v. Norton,* 717 F.2d 767 (3d Cir.1983); *United States v. Reynolds,* 764 F.2d 1004, 1007 (4th Cir.1985); *In re Conti,* 50 B.R. 142, 150 (Bankr.E.D.Va. 1985). Unlike corporations, natural persons rarely shift tax consequences across years. When the end of the year closes the books on taxes, applying refunds from one year to debts from another more closely resembles the traditional notion of a setoff. See *Boston & Maine Corp.,* 785 F.2d 562 (netting a series of interline debts between rail companies where those debts are finalized on a monthly basis is a setoff). For a corporate taxpayer, this resemblance does not hold true.

■ At all events, to focus exclusively on whether the procedure the IRS employed should be characterized as a setoff would miss the point. Pettibone's obligations are defined by its plan of reorganization. 11 U.S.C. § 1141; *In re Orange Tree Associates, Ltd.,* 961 F.2d 1445, 1448 (9th Cir.1992). That plan and the confirmation order bar only those setoffs not contemplated by the plan. But the plan, as we have stressed, provides for full payment of taxes. At the time of confirmation, that obligation had not been quantified. Pettibone and the IRS were in the midst of negotiations that were not completed until years later. In light of this, "payment in full" is best read as an agreement to pay taxes as determined by normal IRS operating procedures. Pettibone got exactly what it bargained for.

Because the netting of underpayments and overpayments within an audit period does not violate the plan, we need not address the district court's conclusion that the netting would have been permissible as a setoff un-

der the Bankruptcy Code. See *In re De Laurentiis Entertainment Group, Inc.,* 963 F.2d 1269 (9th Cir.1992).

## II

Pettibone believes that the IRS violated its own regulations in its treatment of interest on net balances. According to Pettibone, the IRS erred by deducting interest accrued on underpayments from overpayments in other years prior to the formal assessment of that interest (which did not occur until the completion of the audit). An example shows the nature of the dispute. Suppose that in 1980 Pettibone had a net underpayment of $1 million and in 1981 made a $3 million overpayment. Further assume that the interest rate on unpaid tax obligations is 10%. Interest for one year on the $1 million is $100,000. The IRS proposes to treat Pettibone as owing $1.1 million at the time it made the $3 million overpayment. Net: the IRS owes Pettibone $1.9 million, which earns interest in Pettibone's favor. Under Pettibone's approach, by contrast, the $100,000 interest should not be deducted from the $2 million at the time but should be separately stated. Compound interest would continue to run on both the $100,000 and the $2 million until the end of the audit. The IRS's method worked to Pettibone's detriment because of the asymmetric treatment of interest during the bankruptcy. Under Pettibone's approach, the sum owed to the IRS stopped earning interest between the filing of the petition and the confirmation of the plan, but the debt in its favor earned interest throughout. By increasing both the amount it owed the IRS and the amount the IRS owed it, Pettibone's preferred method gave it a substantial advantage because the reorganization proved to be extended.

In support of its position Pettibone points to 26 U.S.C. § 6611, which provides the means of determining interest on overpayments. Where the taxpayer is to receive interest on an overpayment as a credit against other taxes, interest is paid "from the date of the overpayment to the due date of the amount against which the credit is taken." The "due date" of interest on underpayments, under regulations in force throughout the reorganization, was the date that the interest was assessed. Treas.Reg. § 301.6611–1(h)(2)(v). It follows, Pettibone believes, that an overpayment should accrue interest separately until the date the IRS quantifies and assesses the underpayment interest.

The IRS's first response to this argument is a nonstarter. It argues that Pettibone waived any challenge to the interest computation methodology because it stipulated in the bankruptcy court that if the court agreed with the IRS methodology, the computations were "mathematically accurate." Stipulating to mathematical accuracy is a far cry from agreeing to the substantive reasoning underlying those calculations. This case must be resolved on the merits.

Rather than meeting Pettibone's argument head on, the IRS asserts that Treas.Reg. § 301.6611–1(h)(2)(v) was rendered "obsolete" in 1982 when Congress enacted 26 U.S.C. § 6622. This statute provides for daily compounding of interest on over- and underpayments. According to the IRS, daily compounding means that the concept of a "due date" is no longer appropriate, for interest is "due" as it accrues. In 1994 the Treasury Department amended § 301.6611–1(h)(2)(v) to say just this. It now provides that "interest is due as it economically accrues on a daily basis, rather than when it is assessed." If the new version of § 301.6611–1(h)(2)(v) applies, then the IRS prevails; if the old version applies, then Pettibone prevails. (The IRS does not contend that the new version may be retroactively applied to the extent it works a substantive change.) Which version applies?

Section 6622 requires only that interest compound daily. It says nothing about when crediting should take place. *That* question has been left in the hands of the IRS. *Thor Power Tool Co. v. CIR,* 439 U.S. 522, 533, 99 S.Ct. 773, 781, 58 L.Ed.2d 785 (1979); *American Medical Ass'n v. United States,* 887 F.2d 760, 769–70 (7th Cir.1989); cf. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The old version of regulation § 301.6611 called for crediting when interest was assessed; the new version calls

for crediting as soon as possible. If the question presented in this case were whether the methodology specified by the latest regulation is a permissible interpretation of the statute, the IRS would prevail. If by arguing that the old regulation is "obsolete," however, the IRS means that *only* the approach called for by the new regulation is permissible under the statute, its position is unpersuasive. It is odd to find the IRS asking a court to curtail its discretion, effectively to invalidate a regulation that was on the books between 1982 and 1994, but that is the gist of the agency's position. We think it gives itself too little leeway in filling the lacunae in tax statutes.

As long as the interest rate on obligations owed to the IRS matches the interest rate on those owed to the taxpayer (the situation that existed for solvent taxpayers until 1987), either version of § 301.6611–1(h)(2)(v) produces the same result. Equivalent debts grow at the same rate and may be offset at any time without prejudice to either the IRS or the taxpayer. The asymmetric treatment of unmatured interest under the Bankruptcy Code means that the difference matters for bankrupt taxpayers, but this effect does not render either possible rule "invalid" or "obsolete"—after all, the effect of bankruptcy on interest long predates the 1982 changes to the Internal Revenue Code. A better argument for regulatory "obsolescence" might be that since 1987 the Internal Revenue Code has contained a 1% differential in favor of the government on interest rates for unpaid tax obligations. 26 U.S.C. § 6621(a)(1), (2). A regulation imposing a delay before offsetting mutual debts thus works what may be an impermissible prejudice to taxpayers. The government has not pressed this argument, however, relying instead on the 1982 amendment. As we said, *that* statute permits the approach called for by either version of the regulation.

■ Perhaps, however, the IRS's position is that in the course of the audit it "interpreted" the old version of § 301.6611–1(h)(2)(v), presaging the formal change that was to come in 1994. Just as agencies have the power to interpret statutes entrusted to their care, so too they may interpret their own regulations. *Thomas Jefferson University v. Shalala,* —— U.S. ——, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Stinson v. United States,* —— U.S. ——, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); *Homemakers North Shore, Inc. v. Bowen,* 832 F.2d 408, 412 (7th Cir.1987). This power must not be confused with a power to rewrite. "An agency may not interpret its regulations in a manner so as to nullify the effective intent or wording of a regulation." *Bahramizadeh v. INS,* 717 F.2d 1170, 1173 (7th Cir.1983). The old version of § 301.6611–1(h)(2)(v) states that interest is due when assessed. Yet the approach adopted by the IRS in the audit treats the interest as due in 1986 (or earlier) even though it was not assessed until 1990. It is difficult to reconcile this approach with the language of the regulation. "[D]eference is not abdication, and it requires us to accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ." *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 260, 111 S.Ct. 1227, 1236, 113 L.Ed.2d 274 (1991) (Scalia, J., concurring in part and concurring in judgment).

■ The preamble to the 1994 version of § 301.6611–1(h)(2)(v) states that the amendment is a "clarification" conforming the regulation to existing practice. T.D. 8524, 1994–13 I.R.B. 16. If it is indeed a clarification, rather than a modification, the IRS is on solid ground. See *Pope v. Shalala,* 998 F.2d 473 (7th Cir.1993); *Homemakers North Shore,* 832 F.2d at 413. Cf. *Dickman v. CIR,* 465 U.S. 330, 342–43, 104 S.Ct. 1086, 1093–94, 79 L.Ed.2d 343 (1984) (Commissioner may give retroactive effect to new interpretations of existing statutes and regulations). But the preamble did not discuss Rev.Rul. 83–113, 1983–2 C.B. 251, which states that "the portion of [an] overpayment that offset[s] the *interest* that has accrued on the deficiency will earn interest for the taxpayer from the due date for the year of overpayment until the date the deficiency interest is assessed." In other words, the Commissioner stated in 1983 that the 1982 changes to the Internal Revenue Code had *not* affected the method prescribed by the old version of § 301.6611–1(h)(2)(v). It is an interesting question

whether a published revenue ruling is "binding" until retracted, see *Disabled American Veterans v. CIR*, 942 F.2d 309, 314, 317 (6th Cir.1991) (answering "yes"), but not one we need answer. When an agency "reinterprets" a regulation, it must supply more than assertion. It must show how the current interpretation is consistent with the existing language. Instead of showing how the new version of § 301.6611–1(h)(2)(v) could be reconciled with the old one, and with the understanding reflected in the Revenue Ruling, the Commissioner supplied only an assertion. By omitting the reasoned elaboration required throughout administrative law, the Commissioner surrendered any entitlement to deference.

There are many reasonable interpretations of the provisions of the Internal Revenue Code. The IRS is free to choose among them. Both versions of § 301.6611–1(h)(2)(v) represent permissible choices. In 1994 the IRS changed its view. We do not accept its assertion that the 1994 version merely restates and clarifies the "real" meaning of the older regulation. Accordingly, we affirm the district court's judgment to the extent it allowed continuous offsetting but remand with directions to reduce the judgment in light of our holding on the interest computation.