_____

No. 95-1306MN
_____

Northern States Power Company,  *
a Minnesota Corporation, and     *
Northern States Power Company,   *
a Wisconsin Corporation,         *
                                 * On Appeal from the United
          Appellees,             * States District Court
                                 * for the District of
     v.                          * Minnesota.
                                 *
                                 *
United States of America,        *
                                 *
          Appellant.             *

_____

          Submitted:  October 16, 1995

            Filed:  January 2, 1996
_____

Before RICHARD S. ARNOLD, Chief Judge, WOLLMAN and MORRIS SHEPPARD
     ARNOLD, Circuit Judges.
_____

RICHARD S. ARNOLD, Chief Judge.


     This case presents a narrow and interesting question about how
to interpret several provisions of the Internal Revenue Code.  The
United States appeals from the District Court's tax-refund award to
Northern States Power Company and one of its subsidiaries
(collectively, "NSP").  The District Court granted NSP's motion for
summary judgment, and held that NSP was entitled to have the
interest on its tax refunds computed by offsetting, or "netting,"
its tax underpayments in 1980, 1983, and 1984 against its
overpayments in 1981 and 1982.  This "netting" approach eliminates
the expensive - for NSP - effect of a one per cent. difference

between the interest rates on overpayments and underpayments, that is, between what the Government pays and what it earns.[1]  The United States argues that the tax laws give the IRS discretion to credit a taxpayer's overpayment against the same taxpayer's outstanding liability, and that overpayments and underpayments may be "netted" for interest-calculation purposes only when the IRS decides to make such a credit.  We agree, and reverse.

I.

The relevant facts of this case are not contested.  In 1990, after an audit, the IRS rejected several of NSP's claimed deductions and assessed tax deficiencies against NSP for 1980, 1981, 1983, and 1984.  That same year, NSP paid the IRS over $23 million for the deficiencies, plus interest.  NSP then filed amended returns, asserting previously unclaimed tax credits for 1981, 1982, and 1984, and brought this case, seeking refunds based on these credits.

In 1994, NSP and the IRS settled most of their disputes.  They agreed that NSP had overpaid its taxes in 1981 and 1982, but underpaid in 1980, 1983, and 1984.  And because the agreed-upon deficiencies for 1980, 1983, and 1984 were smaller than was thought when NSP paid its $23 million deficiency, it turns out NSP actually overpaid for all five years.[2]  So the parties agree that NSP is entitled to refunds plus interest for all five years in question (1980-84).  Here, however, NSP and the IRS part company; they do

_____

[1]Congress set the interest rate owed by a taxpayer on underpayments one per cent. higher than the rate paid to a taxpayer on overpayments in the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, § 1511(a).  The rates have changed several times since then, but the rate itself does not matter here.

[2]The parties stipulated the following overpayments:  in 1980, $1,846,947; in 1981, $5,616,786; in 1982, $130,238; in 1983, $311,663; and in 1984, $1,212,867.  In all, NSP overpaid $9,118,501.

not agree on how to calculate the interest due on the refund.  This disagreement is the subject of this appeal.

What makes this case interesting is the gap between the interest rates on underpayments and overpayments.  See I.R.C. (26 U.S.C.) § 6621(a).  If interest accrued on underpayments and overpayments at the same rate, the parties' disagreement would evaporate.  That is, it would make no difference if underpayments and overpayments were "netted," and the applicable interest rate then applied to the difference, or if interest accrued, at the applicable rates, simultaneously and separately on the overpayments and the underpayments.  Either way, it would all come out in the wash.  But the rates are not the same, so netting can, in some cases, save - or cost - a great deal.[3]

In this case, before NSP paid the deficiencies in 1990, it had overpaid in 1981 and 1982 more than it underpaid in 1980, 1983, and 1984.  The United States argues that the interest due NSP should be calculated separately for each of the tax years in question.  But NSP insists the IRS should credit its 1981 and 1982 overpayments against its 1980, 1983, and 1984 underpayments <u>as of the time the underpayments arose</u>.  If the IRS takes this "netting" approach, the interest rate gap does not come into play because, on balance, NSP was, during the relevant years, the United States' creditor, not debtor.

II.

A.

The District Court granted NSP's motion for summary judgment, and held that NSP is "entitled to have the interest on its tax

---

[3]The "netting" method of interest calculation would entitle NSP to an additional $460,000.

refunds for 1980 through 1984 computed by netting the 1981 and '82 overpayments against the '80, '83, and '84 underpayments." The Court agreed with NSP that the 1986 Tax Reform Act, Pub. L. No. 99-514, § 1511(b), 100 Stat. 2085, showed Congress's "specific concern about potential unfairness to taxpayers, [who] had an overpayment in one year and an underpayment in another . . .." The Court stated that "[t]he legislative history which accompanies the Act is explicit in providing that the Service should adopt and implement computerized netting procedures" to "eliminate the unfairness" caused by the higher interest rate for underpayments. Without disparaging the Court's unease with what it perceived to be IRS overreaching, we disagree with its decision. We think this case is controlled by the text of the Internal Revenue Code, not by the Tax Reform Act's, or any other, legislative history.[4]

### B.

Our analysis starts, and in this case ends, with the statutes themselves. See Staples v. United States, 114 S. Ct. 1793, 1797 (1994) (a statute's language is "the starting place in [a court's] inquiry"); Arkansas AFL-CIO v. F.C.C., 11 F.3d 1430, 1440 (8th Cir. 1993) (when Congress's intent is clear from the words of the statute, that is the "end of the judicial inquiry"). We think that when, as here, the statutes are straightforward and clear, legislative history and policy arguments are at best interesting, at worst distracting and misleading, and in neither case authoritative. See Davis v. Michigan Dept. of the Treasury, 489 U.S. 803, 808 n.3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute."); United States v. Field, 62 F.3d 246, 249 (8th Cir. 1995) (when the statutory language is not ambiguous, there is "no need to search for clues to

_____

[4]In its brief, NSP points to the legislative history of other statutes passed since the 1986 Act. The District Court, however, mentioned only the 1986 Act's history when it granted NSP's motion for summary judgment.

Congress' intent in the legislative history").

As both parties recognize, the Internal Revenue Code does provide for the type of "netting" sought by NSP in this case. Under Section 6601(f) of the Code (26 U.S.C.):

> If any portion of a tax is satisfied by credit of an overpayment, then no interest shall be imposed under this section on the portion of the tax so satisfied for any period during which, if the credit had not been made, interest would have been allowable with respect to such overpayment.

So, the IRS may credit a taxpayer's overpayments against its underpayments and thereby sidestep the effect of Section 6621's interest-rate gap. But must it do so in this case?

Section 6601(f)'s netting provision is an exception to the general rules for calculating interest on overpayments and underpayments. See I.R.C. §§ 6601(a); 6611(a), (b)(1), (2).[5] The

---

[5]I.R.C. § 6601(a) provides:

General Rule.--If any amount of tax imposed by this title (whether required to be shown on a return, or to be paid by stamp or by some other method) is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid.

. . .

I.R.C. § 6611 states:

(a) Rate.--Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the overpayment rate established under section 6621.

(b) Period.--Such interest shall be allowed and paid as follows:

(1) Credits.--In the case of a credit, from the date of the overpayment to the due date of

statute makes it plain that its netting provision comes into play "[i]f any portion of a tax is satisfied by credit of an overpayment." Turning next to Section 6402(a) (Authority to Make Credits or Refunds), we find this provision:

> General Rule.--In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to subsection (c) and (d), refund any balance to such person (emphasis added).

Accordingly, the applicable Treasury regulation states that "[t]he Commissioner . . . may credit any overpayment of tax, including interest thereon, against any outstanding liability . . . owed by the person making the overpayment . . .." 26 C.F.R. § 301.6402-1 (1995) (emphasis added).

We agree with the United States that the word "liability" in Section 6402 means "outstanding liability," one that is unpaid when the credit is made. The Treasury regulations support this reading, see 26 C.F.R. § 301.6402-1 (referring to an "outstanding liability"), and we properly defer to these regulations. See Cottage Savings Ass'n v. Commissioner, 499 U.S. 554, 560-61 (1991)

---

the amount against which the credit is taken.

(2) Refunds.--In the case of a refund, from the date of the overpayment to a date (to be determined by the Secretary) preceding the date of the refund check by not more than 30 days, whether or not such refund check is accepted by the taxpayer after tender of such check to the taxpayer. The acceptance of such check shall be without prejudice to any right of the taxpayer to claim any additional overpayment and interest thereon.

. . .

-6-

(courts "must defer to [the Commissioner's] regulatory interpretations of the Code so long as they are reasonable"); Miller v. United States, 65 F.3d 687, 689 (8th Cir. 1995) (same). This is also the reading that makes the most sense, because only an outstanding liability can be "satisfied" by a credit. See I.R.C. § 6601(f). NSP provides no support, other than a strained reading of miscellaneous bits of legislative history, for its assertion that Section 6402(a) is somehow "time-neutral," that a "liability" may be one that no longer exists, but once did. We think this argument withers before the statute's plain meaning. We are likewise not convinced by NSP's attempt to read the word "outstanding" out of the relevant Treasury regulation, 26 C.F.R. § 301.6402-1. In our view, the regulation means what it says.

So there must be an outstanding tax liability, against which an overpayment may be credited, before Section 6402's netting exception comes into play. But even assuming such a liability, the IRS has discretion whether to credit an overpayment to that liability or not. Section 6402 is clear: the IRS "may credit the amount of such overpayment . . . against any liability." See, e.g., In re Ryan, 64 F.3d 1516, 1523 (11th Cir. 1995) ("[Section 6402], plainly gives the IRS the discretion to apply overpayments to any tax liability."); Pettibone Corp. v. United States, 34 F.3d 536, 538 (7th Cir. 1994) (statute "leaves to the Commissioner's discretion whether to apply overpayments to delinquencies or to refund them to the taxpayer"); Estate of Bender v. Commissioner, 827 F.2d 884, 887 (3d Cir. 1987) (discretionary power under § 6402(a) "rests exclusively with the IRS").

NSP argues that -- the IRS's statutorily granted discretion notwithstanding -- Congress has repeatedly insisted that the IRS develop comprehensive and computerized interest-netting procedures, to eliminate the possibility of unfairness caused by the interest-rate gap. NSP cites no case or statutory authority for this argument. Instead, NSP purports to glean a mandate for netting

from the 1986 Tax Reform Act and its legislative history, as well as from the history of several later enactments. NSP notes that when Congress passed the 1986 Tax Reform Act, it authorized the Treasury Department to "coordinate" Section 6621's different interest rates for under- and overpayments with Section 6601(f)'s netting provision. Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, § 1511(b).[6] NSP explains, citing legislative history, that Congress recognized the IRS's need for

> substantial lead time to develop the data processing capability to net . . . underpayments and overpayments in applying differential interest rates. The bill, therefore, provides that the Secretary of the Treasury may prescribe regulations providing for netting of tax underpayments and overpayments through the period ending three years after the date of enactment of the bill. By that date, the committee expects that the IRS will have implemented computerized netting procedures.

S. Rep. No. 313, 99th Cong., 2d Sess. 185, reprinted in 1986-3 C.B. (Vol. 3) v., 185 ; see also H.R. Conf. Rep. No. 841 (Pt. II), 99th Cong., 2d Sess. 785, reprinted in 1986-3 C.B. (Vol. 4) v., 785 (noting that, after three years, "the IRS should have implemented the most comprehensive netting procedures that are consistent with sound administrative practice").

---

[6]Section 1511(b) states:

. . .

(b) COORDINATION BY REGULATION. -- The Secretary of the Treasury . . . may issue regulations to coordinate section 6621 of the Internal Revenue Code . . . with section 6601(f) of such Code. Such regulations shall not apply to any period 3 years after the date of the enactment of this Act.

. . .

We note that this section says the Secretary "may" issue regulations to coordinate the two Code sections. This is not a mandate.

According to NSP, Congress has continued to call for netting of overpayments and underpayments in the legislative history of enactments since 1986. As we said above, however, all this rummaging through the legislative history of statutes other than those at issue is beside the point. See <u>Consumer Product Safety Comm'n v. GTE Sylvania, Inc.</u>, 447 U.S. 102, 117 (1980) ("`the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one'") (citation omitted). The relevant statutes are, we think, quite clear, and we are not convinced that NSP's litany of congressional reports amounts to anything like a mandate. Congress knows very well how to mandate something; it has not done so here. A statement in a report that a committee of Congress "expects" an agency to do something does not have the force of law. The agency may, and probably should, heed such a statement, but a court will not enforce it when the statute itself contains no warrant for doing so.

Thus, the IRS may credit an overpayment against an outstanding liability, and, if it does, Section 6601(f)'s netting provision comes into play. In this case, however, not only has the IRS apparently chosen not to credit the overpayments, there were no outstanding liabilities against which the overpayments might be credited. NSP paid off its tax deficiencies, and then some, in 1990. It then amended its returns and established that it was entitled to refunds, though not to a credit, because, again, it no longer had any outstanding tax liabilities. Under Section 6402, then, the IRS could not credit the overpayments, and so Section 6601(f)'s netting rule does not apply. And we emphasize again that even if NSP had had outstanding liabilities, the IRS is not required to credit overpayments against them, and therefore not required to do the comprehensive netting described in Section 6601(f). In a proper case, the failure to credit overpayments might be reviewable on an abuse-of-discretion basis, but no such argument is made in this case.

IV.

In our view, the language of the relevant statutes answers the question raised in this case. Still, we think it appropriate to comment on two other points discussed in the parties' briefs. First, the parties argue at some length about whether or not the IRS has the technological capacity to make interest netting its standard practice. NSP insists that the IRS routinely does extensive and complicated corporate-refund computations, and that interest netting would not be inordinately burdensome on the IRS. The IRS, on the other hand, insists that implementing a comprehensive netting system would <u>not</u> be "consistent with sound administrative practice."[7]

We do not know if the IRS can do computerized comprehensive netting of the kind sought by NSP or not. But in this case the IRS's capabilities are irrelevant. The statutes are unambiguous, and do not require NSP's proposed accounting methods. If the law did require the IRS to calculate interest by netting overpayments and underpayments, so long as consistent with "sound administrative practice," then the IRS would have to start netting, or show that it could not.

Second, NSP argues that a Seventh Circuit case, <u>Pettibone Corp. v. United States</u>, 34 F.3d 536, supports its position. We disagree. In <u>Pettibone</u>, the court held that the netting of overpayments and underpayments was not a "setoff" within the

_____

[7]NSP claims that in the legislative history of the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388, and of the Uruguay Round Agreements Act ("GATT"), Pub. L. No. 103-465, 108 Stat. 4809, Congress demanded the Treasury develop "the most comprehensive crediting procedures under section 6402 that are consistent with sound administrative practice . . .." H.R. Rep. No. 826(1), Subtitle B, 103d Cong., 2d Sess., <u>reprinted in</u> 1994 U.S. Code Cong. & Ad. News 3773, 3950; H.R. Conf. Rep. No. 964, 101st Cong., 2d Sess., <u>reprinted in</u> 1990 U.S. Code Cong. & Ad. News 2374, 2805-2806.

meaning of the Bankruptcy Code. In <u>Pettibone</u>, as in this case, the IRS and the taxpayer agreed on the amount of underpayments and overpayments, but disagreed on how to net the two sums and on how to calculate interest. <u>Id.</u> at 538. Ironically, the parties' positions in <u>Pettibone</u> were the reverse of those here: the IRS argued for "continuous netting of overpayments, underpayments, and interest on the balance," while the taxpayer wanted to "tally the overpayments and the underpayments separately," with "interest also accru[ing] separately . . .." <u>Ibid</u>. The court did not address whether or not netting was required, but simply held that the netting was not a prohibited setoff. <u>Id.</u> at 542. Thus, <u>Pettibone</u> has little to do with this case. Nevertheless, NSP argues that because the IRS argued for continuous netting in <u>Pettibone</u>, it must use continuous netting here.

We disagree. First, if the IRS were to argue that the tax laws require continuous netting, for interest-calculation purposes, of overpayments and underpayments, it would be mistaken. It is not estopped to take the correct position here. Second, in <u>Pettibone</u>, the IRS credited outstanding overpayments against <u>outstanding</u> underpayments, which it is permitted to do under Section 6402(a). The <u>Pettibone</u> court did discuss Section 6601(f)'s netting procedure, but nothing in that decision suggests netting is required when past underpayments have already been fully paid. In fact, the <u>Pettibone</u> court noted that, under Section 6402(a), the "Internal Revenue Code leaves to the Commissioner's discretion whether to apply overpayments to delinquencies or to refund them to the taxpayer," and emphasized that "[t]here are many reasonable interpretations of the provisions of the Internal Revenue Code. The IRS is free to choose among them." <u>Pettibone</u>, 34 F.3d at 538, 542.

V.

For the reasons discussed in this opinion, we reverse the

judgment of the District Court, and remand for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.