**In re COASTAL BUS AND EQUIPMENT SALES, INC., Debtor.**

**No. 03–11875–WCH.**

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

Sept. 14, 2005.

James C. Gross, Klieman, Lyons, Schindler & Gross, Boston, MA, for Debtor.

Christopher M. Condon, Kevin J. Simard, Riemer & Braunstein LLP, David T. Mazzuchelli, MA Dept. of Revenue, Litigation Bureau, Michael R. Fiore, Special Assistant U.S. Attorney, Boston, MA, Peter M. Pearl, Smith, Gambrell & Russell, LLP, Atlanta, GA, Martha J. Awiszus, Wi-

nokur, Winokur, Serkey & Rosenberg, Plymouth, MA, Michael Lushan, Lushan, McCarthy & Goonan, Brookline, MA, Harold Owen Beede, Healey, Deshaies, Gagliardi & Woelfel, Amesbury, MA, James M. Donovan, Brown & Brown, P.C., Bedford, MA, Henry J. Riordan, U.S. Dept. of Justice, Washington, DC, for Creditors.

## MEMORANDUM OF DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court is a motion (the "Motion") by the Internal Revenue Service (the "IRS") seeking relief from the automatic stay to setoff pre-petition tax overpayments (the "Refund") against unpaid tax liabilities which Coastal Bus and Equipment Sales, Inc. (the "Debtor") incurred during the Chapter 11 case (the "Tax Liabilities"). Both the Chapter 7 Trustee, John J. Aquino (the "Trustee") and a secured creditor of the estate, Citizens Bank of Massachusetts ("Citizens"), filed objections. For the reasons given below, the Motion will be assigned for a further hearing consistent with this memorandum.

### II. BACKGROUND

Debtor is a Massachusetts corporation which was in the business of selling new and used school buses and bus parts. Following a downturn in its sales, the Debtor filed for Chapter 11 bankruptcy protection on March 7, 2003. Shortly thereafter, the Debtor filed the "Debtor's Emergency Motion for Authority to Use Cash Collateral" (the "Cash Collateral Motion"). Citizens claimed a security interest in the Debtor's assets (including buses, bus parts, inventory, accounts receivable, and machinery and equipment) arising from a loan transaction on May 24, 2000.[1] On March 19, 2003, the Court approved a stipulation (the "Stipulation") between the Debtor and Citizens concerning the Cash Collateral Motion.[2] Pursuant to the Stipulation, Citizens was

> granted a security interest to the extent of any diminution in the value of Lender's cash and non-cash Collateral in all of the Debtor's pre-petition and post-petition assets, including, but not limited to, accounts, inventory, equipment, general intangibles, motor vehicles, and goods, real estate, and leasehold interests as well as all products and proceeds thereof.... The lien granted to Lender herein may not be primed by any other lien or encumbrance, whether by order of the Bankruptcy Court or the passage of time.[3]

The Stipulation also provided "[n]otwithstanding anything contained herein the Post–Petition Collateral shall not include any cause of action or proceeds thereof under Chapter 5 of the Bankruptcy Code."[4] Furthermore, the Stipulation contemplated that the Debtor would use cash and non-cash collateral "to pay its ordinary and necessary business expenses as specifically set forth in the Budget," including over $11,000 in payroll taxes through April 11, 2003.[5]

The Debtor and Citizens subsequently extended and amended the Stipulation numerous times. On March 26, 2004, I approved the eleventh amendment (the

---

1. Docket Entry 4. Specifically, the Debtor executed two revolving notes in the amounts of $4,000,000 and $125,000 respectively.

2. Docket Entry 19.

3. *Id.* at 7, ¶ 5(a).

4. *Id.*

5. *Id.* at 5, ¶ 4(a).

"Eleventh Amended Stipulation"), in which the parties added:

The Debtor agrees that in no event shall the Debtor expend any amounts refunded to the Debtor pursuant to its tax filings with the Internal Revenue Service or the Massachusetts Department of Revenue for the calendar years ending on either December 31, 2002 or December 31, 2003, without first obtaining either (i) the prior written consent of the Lender, or (ii) an Order from the Court expressly approving such usage.[6]

On April 14, 2004, I approved the twelfth amendment (the "Twelfth Amended Stipulation"), in which the parties deleted the foregoing addition, but added:

The Debtor agrees that in no event shall the Debtor expend any amounts refunded to the Debtor pursuant to its tax filings with the Internal Revenue Service for the calendar year ending on December 31, 2003, which the Debtor represents is in the approximate amount of $50,000.00, without first obtaining either (i) the prior written consent of the Lender, or (ii) an Order from the Court expressly approving such usage.[7]

. . . .

Immediately upon Debtor's receipts of all amounts refunded to the Debtor pursuant to its tax filings with the Internal Revenue Service for the calendar year ending on December 31, 2002, which the Debtor represents is in the amount of $26,505.00 (the "Tax Refund"), the Debtor shall remit one-hundred percent (100%) of the Tax Refund directly to the Lender to be applied in reduction of the outstanding amount of the Claim.[8]

By the time I approved the Twelfth Amended Stipulation,[9] the Debtor had incurred a portion of the Tax Liabilities to IRS in the amount of $16,033.16.[10]

Despite the references to calendar years ending in December in the Eleventh and Twelfth Amended Stipulations, the Debtor filed federal tax returns for fiscal years ending on September 30, 2002, and 2003. For both years, the Debtor's returns reflected a loss and reported no taxable income. As a result of a deduction for a net operating loss carried back from the fiscal year ending on September 30, 2002, the Debtor claimed the Refund consisting of overpayments of income taxes in the aggregate amount of $26,505, for the prepetition fiscal years ending on September 30, 1997 and September 30, 1998.

On January 26, 2004, the Debtor's accountant made a request by letter that IRS process the Refund. The letter stated:

The loss year return was filed December 3, 2003 and should have been posted by the date of your letter (January 14, 2004), and if not, six weeks has now passed and the return should be posted.

Please expedite handling of this claim as the taxpayer is currently operating in bankruptcy and needs the refund to satisfy creditors.[11]

---

6. Docket Entry 107, at 3, ¶ 2.

7. Docket Entry 122, at 3, ¶ 2.

8. *Id.* at 4, ¶ 3.

9. A review of the Stipulation and the multitude of amended stipulations reveals that no service of any of the motions was made upon the United States or IRS.

10. Claims Register, Claim No. 31. The Debtor had incurred post-petition tax liability for the periods ending December 31, 2003 and March 31, 2004. Claim No. 31 was the most recent amendment of IRS claim for the Tax Liabilities. Claims Register, Case No. 03–11875, Claim Nos. 26–30.

11. IRS Reply, Exhibit S.

The Refund was posted to the Debtor's account with IRS on March 1, 2004. During the pendency of the Chapter 11 case, the Debtor withheld from its employees earnings income and Federal Insurance Contributions Act ("FICA") taxes, however, those funds were never turned over to IRS.

On February 1, 2005, IRS filed a Request for Payment of Internal Revenue Taxes pursuant to 11 U.S.C. § 503 for payroll taxes, penalties and interest as of November 30, 2004, in the amount of $37,140.08.[12] The claim asserted by IRS included post-petition taxes, specifically, taxes withheld during the Chapter 11 case from wages of the Debtor's employees, the Debtor's and employees' shares of taxes under FICA and taxes pursuant to the Federal Unemployment Tax Act ("FUTA").

On November 4, 2004, IRS filed the Motion, seeking dismissal of the Debtor's Chapter 11 case on the grounds that the Debtor's plan was not feasible, and in the alternative relief from the automatic stay. The Debtor subsequently filed a motion to convert the Chapter 11 case to a proceeding under Chapter 7, which I granted on November 30, 2004. Following conversion, the Trustee was appointed. On December 14, 2004, I entered an order on the Motion

mooting the prayer for dismissal of the case, but scheduling for hearing the remaining matters of relief from the automatic stay and the authority of IRS to effectuate a setoff. After a hearing, I took the matter under advisement and the parties were invited to file post-hearing memoranda.[13]

### III. DISCUSSION

The Motion, filed while Debtor was still in Chapter 11, sought permission to setoff a refund due to Debtor as a result of a carryback to a pre-petition year, against post-petition liabilities for withholding, FICA and FUTA taxes. IRS argues that since administrative expenses, such as the post-petition taxes, must be paid in full under any plan, permitting the setoff is an accordance with the filed plan, which contemplated using the refunds to fund the plan. Of course, the conversion moots any consideration of plan provisions. IRS also argues that the automatic stay does not apply or, if it does, that IRS is entitled to relief under federal common law or 11 U.S.C. § 106(c).[14]

Subsequent to the conversion to Chapter 7, the Trustee opposed the Motion, asserting that the claims against which the setoff is sought to be applied lack mutuality and

12. Claims Register, Case No. 03–11875, Claim No. 31. The Chapter 7 Trustee asserts that the IRS claim may be overstated because it includes estimated taxes for the fourth quarter of 2004, which includes periods after conversion and when the Debtor had ceased operations.

13. Prior to the hearing IRS had filed its "Supplement to Motion to Lift Stay" (the "Supplement Motion"), Docket Entry 197. Following the hearing, the Trustee filed his "Response of Chapter 7 Trustee to United States' Supplement to Motion to Lift Stay" (the "Trustee's Response"), Docket Entry 212, and IRS filed the "United States' Reply to Trustee's Supplemental Response Regarding Its Motion to Lift Stay" (the "IRS Reply"), Docket Entry 214. I

subsequently requested supplemental memoranda on the application of the doctrine of recoupment to the Motion. IRS responded. "United States' Brief Addressing the Application of the Doctrine of Recoupment to its Motion to Life Stay" (the "IRS Recoupment Brief"), Docket Entry 234. Citizens did not file a post-hearing memorandum on the matter.

14. "Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate." 11 U.S.C. § 106(c).

hence setoff is not permitted by § 553(a), which recognizes "any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case ... against a claim of such creditor against the debtor that arose before the commencement of the case...," subject to exceptions not relevant here.

Citizens joins the Trustee in arguing that mutuality is not present under the facts of this case and further argues that it has a superior interest to that of IRS in the Refund precluding any setoff by IRS.

## A. Applicability of the Automatic Stay to Setoff by IRS

IRS contends that it is seeking relief from the automatic stay only out of an abundance of caution because the automatic stay is inapplicable to its right to setoff the Refund against the Tax Liabilities.[15] In response to the Trustee's objection, IRS makes three arguments: First, that § 553 is inapplicable since it deals only with mutual prepetition debts; second, that setoff is not stayed by § 362(a)(7); and finally that setoff is not stayed by § 362(a)(3).

### (i) 11 U.S.C. § 553

 IRS is, of course, correct in contending that § 553 only applies to debts which are both pre-petition. It does not address debts which are both post-petition nor does it deal with debts which do not fall on the same side of the filing. For the latter types of transactions, we must seek guidance from the common law.[16] Judge Queenan addressed the issue some years ago:

> As developed at common law, the doctrine of recoupment permits the crediting of reciprocal rights against each other where those rights arose under the same transaction, typically the same contract. The doctrine of setoff, on the other hand, allows the crediting of reciprocal rights which arise from different transactions. The distinction between recoupment and setoff was recognized under the former Bankruptcy Act. Nothing in the legislative history of the present Bankruptcy Code indicates any intent to reject the right of recoupment or to ignore the distinction between it and setoff.[17]

 I adopted the same analysis in a subsequent decision, and held that "a comprehensive single agreement may not even by necessary if the relationship of the contracts is sufficiently close." [18]

Only IRS responded to my request for supplemental briefing. Its initial argument appeared to follow my reasoning quoted above:

> A taxpayer is not entitled to a refund unless an overpayment was made by the taxpayer for a particular tax and a particular tax period. The question of whether an overpayment was made involves a redetermination of the entire liability. It involved setoff only and there is no application of recoupment on the facts.

---

15. Supplement Motion at 1.

16. I disagree with the Second Circuit's dictum that "the requirements of 11 U.S.C. § 553[are] that to be preserved in bankruptcy a setoff must involve pre-petition mutual debts." *Aetna Cas. & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 781 (2nd Cir.1996). That case involved a priority dispute between a subrogee of the U.S. Department of Labor, holder of a pre-petition claim, and IRS which asserted a post-petition

17. *Mohawk Inds., Inc. v. United States (In re Mohawk Inds., Inc.)*, 82 B.R. 174, 176 (Bankr. D.Mass.1987) (citations omitted).

18. *Bob Brest Buick, Inc. v. Nissan Motor Corp. (In re Bob Brest Buick, Inc.)*, 136 B.R. 322, 324 (Bankr.D.Mass.1991).

tax liability. The tax liability includes any applicable penalties and interest related to the tax. As such, in a suit for a refund of taxes, the Government may raise, as matter of right under the common law doctrine of recoupment, a challenge to any item affecting the computation of the overpayment.... Even where a challenged item involves another taxpayer, another type of tax, or another tax period, equitable recoupment may still permit the abatement or reduction of the overpayment where a single transaction, item, or taxable event is involved.[19]

Having gone this far as matter of common law, IRS then directs my attention to § 6402(a) of the Internal Revenue Code:

General rule-In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment ... against *any liability in respect of an internal revenue tax on the part of the person who made the overpayment* and shall ... refund any balance to such person.[20]

Having established this background, IRS concludes:

Since different taxes and periods are involved here, and no single transaction, item, or taxable event is involved, the doctrine of recoupment has no application to the facts of this case. Section 6402(a), however, does apply here.... To the extent that Section 6402(a) codifies a right of recoupment, instead of a right of offset, the Bankruptcy Code does not place any limits on the abatement or reduction of the overpayments.[21]

■ I disagree in part with the quoted language and find myself adopting an interpretation which is more favorable to IRS than that which it itself espouses. The test I established in *Bob Brest Buick* permits recoupment "if the relationship of the contracts is sufficiently close."[22] In the context of the present case, I hold that the taxes and tax years at issue here form a unified whole where recoupment is singularly appropriate.

I find support for this position in Judge Easterbrook's opinion for the Seventh Circuit in *Pettibone Corp. v. United States.*[23] The court approved the decision of the district court which upheld multi year netting of tax overpayments and underpayments "as 'an accounting method' and not the type of 'setoff' or 'offset' contemplated by the Bankruptcy Code."[24] He continued:

Unless the parties have distinct obligations to each other, the concept of "setoff" makes no sense. By reopening and adjusting each of the tax periods from 1973 through 1986 at the same time, the IRS effectively transformed the 13–year stretch into one accounting period. Nominal "underpayments" and "overpayments" within the audit period were merely intermediate steps in an attempt to determine Pettibone's taxes. Although this audit states taxes for each year, the calculations spanned many years. Corporate taxpayers file yearly returns, but those returns are in many respects contingent. They are subject to modification when future events with tax consequences for the year in question come to pass. For instance, many of the underpayments and overpayments

19. IRS Recoupment Brief at 5.

20. 26 U.S.C. § 6402(a) (emphasis added).

21. IRS Recoupment Brief at 6.

22. 136 B.R. at 324.

23. 34 F.3d 536 (7th Cir.1994).

24. *Id.* at 539.

in the present case resulted from tax loss carrybacks: losses from later years attributed to earlier years for tax purposes. See 26 U.S.C. § 172.

Loss carrybacks exemplify the interdependence among periods within the corporate taxation system and show that from both economic and legal standpoints the nominal one-year accounting period for taxes is deceiving ... This interdependence acquires special significance during an audit, when many tax years are open simultaneously. Operating losses shift among the periods, altering tax consequences; an underpayment for one year may reflect nothing more than the movement of a loss from that year to another, simultaneously resulting in an overpayment for the latter year. Treating the calculations within an audit period as setoffs would make sense only if the tax obligation for each year were independent. Independence among the periods makes such a characterization inappropriate for corporate taxpayers.[25]

I conclude that it is appropriate for IRS to apply any available tax refund to the post-petition taxes due from Debtor. As a result, consideration of the application of the automatic stay is unnecessary at this time.

I reach this result without regard to § 6402(a) of the Internal Revenue Code, quoted above. That statute encompasses both setoff and recoupment. As to recoupment, it is not essential other than to recognize that the doctrine exists. As to setoff, it is subject to the automatic stay, but, given my holdings, that is not a consideration here.[26]

## B. Citizens Bank's Interest in Debtor's Claim of Refund

██ IRS disputes the validity of any pre-petition security interest which Citizens claims in the Refund based upon the Assignment of Claims Act.[27] The argument is ill taken. The purpose of the Assignment of Claims Act is to "invalidate transfers of ... claims against the government .... so that the government would always be able to 'deal exclusively with the original claimant and would always be aware of its obligations.'"[28] The focus of the statute "is not on the perfection of liens and security interests, but rather the establishment of procedural requirements of assignees planning to assert claims against the government."[29] The fact that Citizens did not comply with the Assignment of Claims Act in no way affects the validity or perfection of its security interest. The Assignment of Claims Act does not estab-

25. *Id.* at 539. *Contra, Aetna Cas. & Surety Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 780 (2nd Cir.1996) ("By arguing that the 'accounting' procedure under 6402(a) is something other than an ordinary right of setoff, the government in essence asks us to find that the bankruptcy laws do not apply to the IRS. This we cannot do.").

26. This interpretation also has the benefit of reconciling the decisions in *Chateaugay* (a setoff case) with *Pettibone* (recoupment).

27. "An assignment may be made only after a claim is allowed, the amount of the claim is decided and a warrant for payment of the claim has been issued. The assignment shall

specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose." 31 U.S.C. § 3727(b).

28. *United California Discount Corp. v. United States*, 19 Cl.Ct. 504, 507 (1990).

29. *In re Robert E. Derecktor of Rhode Island, Inc.*, 142 B.R. 29, 30 (Bankr.D.R.I.1992).

lish a national filing system is therefore is not one of those federal statutes that supercedes the Uniform Commercial Code.[30] To the extent that Citizens has rights under its pre-petition financing arrangements with Debtor, those rights continue to exist. Unfortunately, the record before me does not provide a basis for ruling upon the extent and amount of Citizen's position, and as the Trustee disputes the amounts claimed by IRS, a final conclusion must await another day. Of course, if it turns out that there will be no net proceeds of the Refund to Debtor, the issue becomes moot.

■ Citizens further contends that the Stipulation gives it a first-priority security interest in the Refund superior to IRS's claimed setoff right. The Stipulation, however, as quoted above, contained a provision specifically exempting from Citizens' security interest any "cause of action or proceeds thereof under Chapter 5 of the Bankruptcy Code." In order to obtain either a judgment determining or for turnover of the Refund, the Trustee would have to bring an action under §§ 505 or 542, respectively. Both provisions are within Chapter 5 of the Bankruptcy Code and must be brought as adversary proceedings.[31] The Debtor's tax refund claim would arise as a "cause of action" and any recovery thereon would arise as "proceeds" under Chapter 5 of the Bankruptcy Code. As the parties carved out this exception to the security interest created in the Stipulation, I conclude Citizens has no interest in the Refund pursuant to the Stipulation, whatever its rights may be under its pre-petition security interest.

■ Arguably, Citizens may have had some claim to an interest arising under the Twelfth Amended Stipulation which directed the Debtor to pay over to Citizens all of the Refund arising from the calendar year ending on December 31, 2002. Fed. R. Bankr.P. 4001(b), however, requires that a motion for authorization to use cash collateral "shall be served on any entity which has an interest in the cash collateral" and service shall be in accordance with Fed. R. Bankr.P. 9014. The first-cited section provides "the motion shall be served in the manner provided for the service of the summons an complaint by Rule 7004." Fed. R. Bankr.P. 7004(b)(5) requires that service upon the United States be made by first class mail. Where the United States has not been properly served, personal jurisdiction is lacking and an order affecting the rights of the United States is void.[32]

By the time I approved the Twelfth Amended Stipulation, the Debtor had already incurred post-petition liabilities to IRS. Indeed, the Twelfth Amended Stipulation specifically addressed the Refund. I conclude that because no service was made upon the United States, the amendments to the Stipulation are not binding on IRS, and do not create a post-petition interest in Citizens' favor superior to that of IRS, even if it could have obtained such an interest by proper notice to IRS.[33]

### IV. Conclusion

My conclusion that IRS may exercise its right of recoupment against the refund

---

30. Official Comment 2 to U.C.C. § 9–311 (2000 revision).

31. Fed. R. Bankr.P. 7001(1).

32. *United States v. Laughlin (In re Laughlin )*, 210 B.R. 659, 661 (1st Cir. BAP 1997).

33. IRS argued that the Trustee lacks standing to object to the Motion insofar as Citizens holds a secured claim in the tax refund. Given my conclusion that I cannot at this point determine if Citizens has such a claim, I will defer consideration of this objection.

claim moots the parties' arguments concerning the application of the automatic stay, at least until a determination of the amount of the IRS claim. As noted above, there are several matters upon which I cannot issue a final ruling at this point. A further hearing will be necessary. In order to give the parties an opportunity to confer and perhaps narrow the remaining issues, I will schedule a status conference on this matter for October 26, 2005, at 9:30 a.m. If the parties are able to stipulate to matters as yet undecided, the hearing may be cancelled.