IRVINE MEDICAL CENTER,
Plaintiff-Appellant,

v.

Tommy G. THOMPSON,* Secretary of the Department of Health & Human Services, Defendant-Appellee.

Arizona Rehabilitation Hospital, Inc., (Medical Provider No. 3–3026), dba Novacare Valley of the Sun Rehabilitation Hospital; Arizona Rehabilitation Hospital, Inc. (Medical Provider No. 03–5212), dba Novacare Valley of the Sun Rehabilitation Hospital, Plaintiffs-Appellants,

and

Novacare Meridian Point Rehabilitation Hospital, Inc. (Medical Provider No. 03–3025); Tucson Regional Rehabilitation Hospital, Inc. (Medical Provider No. 03–3028); Novacare Rehab Agency

of Georgia, Inc. (Medical Provider No. 11–6533); Novacare Rehab Agency of Illinois, Inc. (Medical Provider No. 14–6518); Novacare Tri–State Regional Rehabilitation Hospital, Inc. (Medical Provider No. 15–3025); Rehabilitation Corporation of Virginia (Medical Provider No. 49–3028) dba Novacare Rehabilitation Hospital of Virginia, Plaintiffs,

v.

Tommy G. Thompson,* Secretary of the Department of Health and Human Services, Defendant-Appellee.

Nos. 99–56319, 00–15757.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 2001

Filed Jan. 4, 2002

---

* Tommy G. Thompson is substituted for his predecessor, Donna E. Shalala, as Secretary of Health and Human Services. Fed. R.App. P. 43(c)(1).

Jonathan P. Neustadter, Hooper, Lundy & Bookman, Inc., Los Angeles, California, Ronald N. Sutter, Powers, Pyles, Sutter & Verville, P.C., Washington, D.C., for the plaintiffs-appellants.

Richard K. Waterman, Department of Health & Human Services, San Francisco, California, for the defendant-appellee.

Before: PREGERSON, CANBY, and THOMPSON, Circuit Judges.

Opinion by Judge CANBY; Dissent by Judge PREGERSON.

CANBY, Circuit Judge:

This is a consolidated appeal brought by Medicare service providers against the Secretary of the Department of Health and Human Services ("Secretary"). The plaintiffs contend that the Secretary acted unlawfully in repealing a regulation that had allowed providers to carry forward reasonable costs disallowed in a particular fiscal period to succeeding fiscal periods. In both actions, the district courts awarded summary judgment to the Secretary, on the ground that the repeal was based on a permissible interpretation of the underlying Medicare statute. We conclude that the repeal did not contravene a clearly expressed congressional mandate, was not based on an unreasonable interpretation of the Medicare statute, and was not an arbitrary or capricious agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). We accordingly affirm the judgments of the district courts.

## Statutory Background[1]

The Medicare program, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, provides payment for medical care for the aged and disabled. Eligible beneficiaries receive medical care from "providers," which are medical care facilities that have entered into agreements with the Secretary to furnish care, and the providers are then reimbursed by the Medicare program. Part A of the Medicare program authorizes payments for institutional care provided primarily on an inpatient basis. *See* 42 U.S.C. §§ 1395c–1395i–4. Part B of the program authorizes payments primarily for outpatient services and durable medical equipment. *See id.* §§ 1395j–1395w–4.

Medical care facilities, such as plaintiffs, receive reimbursement under Part A or Part B (or both) from a "fiscal intermediary," such as Mutual of Omaha, that functions as the Secretary's agent in making payment on covered claims. At the close of each fiscal year, a provider must submit a "cost report" to the fiscal intermediary showing the costs it has incurred, and the appropriate portion of such costs to be allocated to the Medicare program during the fiscal period covered by the cost report. 42 C.F.R. §§ 413.20, 413.24.

When it was originally enacted in 1965, the Medicare program reimbursed providers on the basis of their "reasonable costs" for both inpatient and outpatient services. In 1972, Congress amended the Medicare Act to impose a limit on Medicare payments, restricting the annual reimbursement to a provider's aggregate reasonable costs or aggregate customary charges, whichever is lower. *See* Soc. Sec. Amendments of 1972, P.L. 92–603, § 233, codified at 42 U.S.C. § 1395f(b). The purpose of the amendment was to prevent Medicare from paying more for services than the provider was charging its non-Medicare patients. This restriction, known as the "lower of costs or charges" principle ("LCC"), applied to reimbursement for services under both Part A (inpatient) and Part B (outpatient). It is the LCC principle of the Medicare statute that is implicated in this appeal.

The effect of the LCC restriction was to limit the amount of reimbursement so that,

---

1. We take this section largely from the district court's opinion in *Irvine Med. Ctr. v. Shalala,* 63 F.Supp.2d 1137 (1999).

if a provider's customary charges were less than its reasonable costs, Medicare would reimburse only the provider's charges, not its costs that were in excess of customary charges. Congress provided an exception to this limitation for providers that furnish services free of charge or at nominal charge to the public. Such public providers would continue to receive reimbursement of full reasonable costs. *See* 42 U.S.C. § 1395f(b)(2).

In their reports on the 1972 amendments, both the House and Senate committees explained the rationale for the LCC restriction and the single exception for public providers. Both reports also contain an additional paragraph in which the committees acknowledged the potential negative effect of the restriction on institutions experiencing higher than normal costs for a limited period of time. The House Committee Report (like the Senate Committee Report) stated:

> [Y]our committee recognizes the desirability of permitting a provider that was reimbursed under the medicare ... program[] on the basis of charges in a fiscal period to carry unreimbursed allowable costs for that period forward for perhaps two succeeding fiscal periods. Should charges exceed costs in such succeeding fiscal periods, the unreimbursed allowable costs carried forward could be reimbursed to the provider along with current allowable costs up to the limit of current charges.

H.R. Rep. No. 92–231, at 102 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5088; *see also* S.Rep. No. 92–1230, at 203 (1971) (using virtually identical language).

This admonition was not lost on the Secretary. In 1974, the Secretary issued a regulation implementing the LCC restriction. 39 Fed. Reg. 16,882 (May 10, 1974), adding a new section 20 C.F.R. § 405.455(now set forth as amended at 42 C.F.R. § 413.13). Under subsection (d) of this regulation, an established provider whose allowable costs exceeded its charges in one fiscal period could carry those unreimbursed costs forward for two succeeding years. A new provider could carry forward unreimbursed costs for five years.

In 1986, the Secretary published notice of a proposed rule to eliminate the carry-forward provision. 51 Fed. Reg. 33,074 (Sept. 18, 1986). The Secretary promulgated the final regulation in 1988, eliminating the carry-forward provision entirely, effective for fiscal periods beginning on or after April 28, 1988. 53 Fed. Reg. 10,077 (Mar. 29, 1988), 42 C.F.R. § 413.13.

## Factual Background

Plaintiffs in this case are nine Medicare health care providers that suffered an LCC disallowance for costs in excess of charges in a reporting year occurring after the LCC carry-forward provision was repealed. Eight of the nine plaintiffs fit within the agency's definition of "new provider" in the year in which they suffered the LCC disallowance. *See* 42 C.F.R. § 413.13(a) (1999). Under the former carry-forward provision, the eight new providers would have been entitled to carry their unreimbursed costs forward for five years, and the ninth plaintiff would have been entitled to do so for two years. Plaintiffs filed appeals with the Provider Reimbursement Review Board ("PRRB") challenging the validity of the repeal. Pursuant to plaintiffs' requests, the PRRB determined that it lacked the authority to decide the issue of the validity of the repeal. Plaintiffs then brought these actions challenging the Secretary's repeal of the carry-forward provision.

The district courts in both cases granted summary judgment to the Secretary, and denied the plaintiffs' requests for summary judgment. Both courts reasoned that the

Secretary's action was neither contrary to congressional intent, nor "arbitrary and capricious." The plaintiffs now appeal.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo both the district court's interpretation of the Medicare statute, and its award of summary judgment. *Lindsey v. Tacoma–Pierce County Health Dep't,* 195 F.3d 1065, 1068 (9th Cir.1999).

## Discussion

At issue in this case is whether the Secretary's promulgation of 42 C.F.R. § 413.13, which eliminated the carry–forward provision previously granted by the Secretary, is valid. Our review is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A),(E). *French Hosp. Med. Ctr. v. Shalala,* 89 F.3d 1411, 1416 (9th Cir.1996). The initial questions we must address concern the appropriate level of deference to the Secretary's construction of the statute under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first inquiry under *Chevron* is whether Congress has "directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If Congress has done so, that ends the review, because the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If Congress has not explicitly mandated a particular result, the next question is whether the Secretary's action "is based on a permissible construction of the statute." *Id.* If so, we defer to it unless—and this is our third inquiry—the action of the

Secretary is arbitrary or capricious, *see id.* at 844, 104 S.Ct. 2778, within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### 1. Congress Did Not Unambiguously Mandate a Carry–Forward Provision.

The plaintiffs first contend that the Secretary's repeal of the carry-forward provision must be invalidated under the first step of the *Chevron* analysis, because the repeal contravened a clearly expressed congressional directive requiring the Secretary to provide a carry-forward. While it is clear that Congress *permitted* the Secretary to implement a carry-forward provision, it is far from clear that Congress *required* such a provision.

Our interpretation of the Medicare statute begins, as it must, with its text. *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992). Significantly, the text nowhere even mentions a carry-forward.[2] Although the plaintiffs urge us to treat this silence as inconsequential, or at least ambiguous, we interpret this silence as an indication that Congress deliberately chose *not* to mandate a carry-forward. When enacting the 1972 amendments, Congress considered the possibility of a carry-forward exception to the LCC principle. *See* H.R. Rep. No. 92–231, at 102; S.Rep. No. 92–1230, at 203. Had Congress intended to mandate such a carry-forward, it almost certainly would have included such a requirement in the text of the statute, as it has done in other instances in which an agency is required to permit a carry-for-

---

2. The statute provides in relevant part:
   The amount paid to any provider of services ... shall ... be: (1) except as provided in paragraph (3), the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title and as

further limited by section 1395rr(b)(2)(B) of this title, or (B) the customary charges with respect to such services[.]
42 U.S.C. § 1395(f)(b)(1). The other sections referred to in the above passage also make no mention of a carry-forward.

ward. *See, e.g.,* 26 U.S.C. § 172 (mandating in the statutory text a carry-forward for losses); 26 U.S.C. § 382 (dealing with a carry-forward provision in great detail in the statutory text). Supporting this view is the fact that Congress *did* provide for a different exception to the LCC principle in the text of the LCC statute. *See* 42 U.S.C. § 1395f(b)(2) (mandating an exception to the LCC for providers who furnish services to the public free of charge or at a nominal charge). By comparison, Congress's statutory silence with regard to the carry-forward is most reasonably viewed as an indication of Congress's intent *not* to require the Secretary to provide for it.

The plaintiffs attempt to draw a statutory command from the legislative history of the 1972 LCC amendment.[3] Committees of the House and Senate included virtually identical language in their reports:

> Your committee recognizes that a provider's charges may be lower than its costs in a given period as a result of miscalculation or special circumstances of limited duration, and it is not intended that providers should be penalized by such short-range discrepancies between costs and charges. Nor does the committee want to introduce any incentive for providers to set charges for the general public at a level substantially higher than estimated costs merely to avoid being penalized by [the LCC] provision. Thus, your committee recognizes the desirability of permitting a provider that was reimbursed under the medicare ... program[] on the basis of charges in a

fiscal period to carry unreimbursed allowable costs for that period forward for perhaps two succeeding fiscal periods.

H.R. Rep. No. 92–231, at 102; *see also* S. Rep. No. 92–1230, at 203 (using virtually identical language). This language, however, falls far short of amounting to a statutory mandate.

First, in the context of the statute's silence concerning a carry-forward provision, the committees' statements that a carry forward would be "desirable" did nothing more than reflect Congress's understanding that the LCC provision could have some unnecessarily harsh consequences, and that the Secretary would have discretion to temper these effects by permitting a carry-forward. Without this language, there would have been a substantial question as to whether the Secretary even had discretion to *consider* implementing a carry-forward. These statements foreclosed that question, but they did not rise to the level of a mandate to the Secretary to implement a carry-forward exception to the LCC provision. The reports unquestionably encouraged the Secretary to allow a carry-forward, but they said nothing about *requiring* one; the reports say only that a carry-forward would be "desirable." *Cf. Portland Feminist Women's Health Ctr. v. Advocates For Life, Inc.,* 859 F.2d 681, 685 (9th Cir.1988) (recognizing that "desirable" does not mean "required"); *Save Lake Washington v. Frank,* 641 F.2d 1330, 1335 (9th Cir. 1985) (same). "Desir-

**3.** We have stated that we "cautiously adhere" to the practice of consulting legislative history in attempting to ascertain a clear congressional directive under *Chevron. American Rivers v. Federal Energy Reg. Comm'n,* 201 F.3d 1186, 1196 n. 16 (9th Cir.2000). Here, we look to the legislative history because it strongly supports the view that that text's silence concerning a carry-forward was an indication that Congress chose *not* to require a carry-forward provision. We express no view as to whether the legislative history alone could have been sufficient to create a clear congressional directive had it stated that a carry-forward was required. *But cf. Shannon v. United States,* 512 U.S. 573, 584, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) ("[C]ourts have no authority to enforce a principle gleaned solely from legislative history that has no statutory reference point.").

830

ability" is not the language of command. Thus the committees' choice of language supports the view that Congress deliberately left the statute silent, in order to allow, but not require, a carry-forward. *Cf. Northern States Power Co. v. United States,* 73 F.3d 764, 768 (8th Cir.1996) ("Congress knows very well how to mandate something.... A statement in a report that a committee of Congress 'expects' an agency to do something does not have the force of law."). And certainly, key to the *Chevron* analysis, these statements did not constitute an "unambiguously expressed" mandate.[4] *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. Consequently, we must turn to the second step of the *Chevron* analysis.

### 2. The Secretary's Interpretation of the Statute Is a Permissible One.

■ Our analysis under the second step of *Chevron* can be brief, because our conclusion follows from what we have already said about Congress's intent. The Secretary has taken the position that the LCC statute, in light of its legislative history, permits but does not require the Secretary to implement, or continue to implement, a carry-forward regulation. *See* 53 Fed. Reg. at 10,080. We have just explained why we view this interpretation to be the

one that Congress intended. It is not necessary, however, that we conclude that the Secretary's interpretation is the one we would adopt. We are called upon to determine only whether the Secretary's interpretation "is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. In light of the reports of the congressional committees expressing the desirability, but not the requirement, of a carry forward, and the silence of the statute, the Secretary's interpretation is certainly a permissible one.[5] We therefore defer to it under *Chevron.*

### 3. The Secretary's Repeal of the LCC Regulation Was Not Arbitrary or Capricious.

The plaintiffs next contend that, even if the Secretary's repeal did not contravene an unambiguously expressed congressional mandate, the repeal was nonetheless arbitrary or capricious and cannot withstand review under the APA. *See* 5 U.S.C. § 706(2)(A),(E); *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. We reject the contention.

■ In pressing their argument here, the plaintiffs face an uphill battle. Our review of whether the repeal was arbitrary or capricious is "highly deferential, pre-

---

**4.** The plaintiffs emphasize that the carry-forward regulation was in place for fourteen years prior to the repeal, without Congress ever taking action to preclude the Secretary from allowing the carry-forward. This observation is of no help to the plaintiffs. Courts are generally slow to attribute significance to the failure of Congress to initiate particular legislation. *See, e.g., Aaron v. SEC,* 446 U.S. 680, 694 n. 11, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Moreover, the legislative acquiescence in the carry-over regulation is consistent with the view that Congress left the decision to the Secretary. Since the repeal in 1988, Congress has taken *no* action to require a carry-forward provision, which weakens

further the plaintiffs' contention that Congress sought to mandate a carry-forward.

**5.** The plaintiffs contend that, even if the statute did not require the Secretary to implement a carry-forward provision, the concerns expressed in the Committee Reports indicate that *some* form of comparable relief was required. This argument overlooks the principle of agency deference. The Secretary's interpretation of the statute is a permissible one, and the fact that there are other plausible readings is irrelevant. Moreover, the lack of mandatory language by Congress makes it implausible that it was commanding any form of relief.

suming the agency action to be valid."[6] *Indep. Acceptance Co. v. California,* 204 F.3d 1247, 1251 (9th Cir.2000) (citations omitted); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (noting that the scope of review under the arbitrary and capricious standard is narrow and that a court should not substitute its judgment for that of the agency).

■ The plaintiffs nonetheless point out that an agency regulation can be found to be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alvarado Cmty. Hosp. v. Shalala,* 155 F.3d 1115, 1122 (9th Cir.1998). The record, however, does not support the view that the Secretary made any of these missteps.

In repealing the regulation, the Secretary followed a logical course, identifying the types of entities most likely to be the most significantly affected, and determining whether continuation of the carry-forward was necessary for those providers. Although some of the assertions offered by the Secretary in justifying the repeal were debatable, none of the assertions was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Consequently, un-

der the deferential standard of review implicated here, *Indep. Acceptance Co.,* 204 F.3d at 1251, we cannot agree with the plaintiffs' contentions that the repeal was arbitrary or capricious. We address in turn the plaintiffs' specific challenges to the validity of the repeal.

a. *The Secretary's Rationale for Eliminating the LCC Carry–Forward Was Not Irreconcilable with Promulgation of the Carry–Forward Regulation in 1974.*

■ In the preamble to the final regulation that repealed the carry-forward provision, the Secretary indicated that retention of the carry-forward "would be contrary to ensuring Congress' intent in enacting the LCC principle, which was that Medicare pay no more than the provider charges non-Medicare patients responsible for payment on a charge basis." 53 Fed. Reg. at 10,081. The plaintiffs contend that, by this logic, the earlier regulation permitting the carry-forward "violated" the Medicare statute for fourteen years.

We find no irrationality on the part of the Secretary. The preamble to the repeal regulation merely acknowledged that elimination of the LCC carry-forward would give wider application to the LCC rule itself, and thereby more fully implement the primary purpose of the LCC rule: that Medicare pay no more than the provider charges non-Medicare patients responsible for payment on a charge basis. The carry-forward was an exception to

**6.** The plaintiffs contend that the repeal at issue here is entitled to considerably less deference than is ordinarily afforded to agency regulations, because the repeal reversed a longstanding agency policy. This contention fails in light of the Supreme Court's decision in *Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). There, the Court rejected the notion that an agency's interpretation "is not entitled to deference because it represents a sharp break with prior interpretations of the statute in question," and noted that "[a]n agency is not required to establish rules of conduct to last forever, but rather must be given ample latitude to adapt its rules and policies to the demands of changing circumstances." *Id.* (internal quotations and citations omitted).

that principle, and any exception by its nature has a thrust contrary to the general principle from which the exception is carved. From 1974 to 1988, the Secretary made the discretionary decision that the benefits of having the carry-forward provision exceeded the costs. By 1988, the Secretary had determined that the benefits of the carry-forward no longer exceeded the costs, and therefore decided that elimination of the carry-forward provision would be a significant way to promote the primary purpose of LCC rule.

    *b.  The Secretary Plausibly Concluded that the Carry- Forward Provision Could Result in Medicare Paying More than the Public for Medical Services.*

■ The plaintiffs next contend that the Secretary's rationale for eliminating the carry-forward—that continuation of the carry-forward could result in Medicare paying more than the provider charges the public—was factually incorrect. According to the plaintiffs, the LCC carry-forward provision, as it operated under the former regulation, could *never* result in Medicare paying more for services than the general public pays because reimbursement in the succeeding year was limited to the charges paid by the public. *See* 42 C.F.R. § 413.13 (h)(2)(ii), (5)(ii)(B)(1998).

The flaw in the plaintiffs' argument is that costs that are carried forward result in a reimbursement in the succeeding year that exceeds the amount otherwise payable (lowest of cost or charges). As a consequence, the reimbursement for carried-over costs amounts to a Medicare payment for services that were rendered in the *previous* year—services for which Medicare has already paid the provider's full reimbursable amount. Viewing the carry-forward in this light, for any single year in which costs were carried over and reimbursed, Medicare can be seen as "paying more than the provider charged non-Medicare" patients for that year's services.[7] As a result, the Secretary's view was at least plausible, and we must defer to it. *See Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. 2856.

    *c.  Repeal of the LCC Carry–Forward Regulation Did Not Clearly Violate Congressional Intent to Avoid Any Incentive for Providers to Raise Charges Substantially Higher than Costs.*

■ The plaintiffs next contend that the Secretary acted arbitrarily by failing to follow the desire of the congressional committees not "to introduce any incentive . . . to set charges for the general public at a level substantially higher than estimated

7. To illustrate:

|  | Reasonable Costs | Customary Charges | Medicare Payment |
|---|---|---|---|
| Year 1 | $200 | $150 | $150 |

As a result, $50 can be carried forward. Then:

|  | Reasonable Costs | Customary Charges | Medicare Payment |
|---|---|---|---|
| Year 2 | $200 | $225 | $225 (including $25 of the carry-forward) |

In Year 2, when the provider receives not only full Medicare reimbursement for its Year 2 costs but also receives a Medicare payment of $25 of carry-forward, that $25 payment is not for the services furnished or the costs incurred in Year 2 because, by definition, the provider has already been reimbursed the maximum amount for all those services when it was reimbursed its entire reasonable costs. The $25 reimbursement therefore may plausibly be viewed as constituting a $25 payment for Year 1, in excess of the charges paid by the public for such services in that year.

costs...." H.R. Rep. No. 92–231, at 102; S. Rep. No. 92–1230, at 203. The plaintiffs refer to the Secretary's acknowledgement that the repeal could cause providers to "raise charges to match (or exceed) costs." 53 Fed. Reg. at 10,080. We find this contention unpersuasive.

The Secretary pointed to a number of reasons why he did "not expect providers to raise charges unnecessarily." 53 Fed. Reg. at 10,800; *see also* 51 Fed. Reg. at 33,077. The Secretary explained that providers would be exempt from the LCC principle if they met the nominal charge provisions, and that, in light of the impact analysis undertaken by the Secretary,[8] most providers would in any event not be greatly affected by the change. 53 Fed. Reg. at 10,080–81; 51 Fed. Reg. at 33,077. Further, the Secretary explained that providers that incurred unreimbursed costs on a nonrecurrent basis may be able to reduce or eliminate these costs through various sound financial practices, and thereby avoid raising charges. 53 Fed. Reg. at 10,080–81. Finally, the Secretary acknowledged that those providers who experience unreimbursed costs on a recurrent basis would not be greatly affected by the repeal, because they were unable to recoup costs even with the carry-forward. *Id.* at 10,080. The Secretary's reasoning provides a rational basis for concluding that repeal was unlikely to result in an unnecessary increase in charges.

> *d. It Was Not Irrational for the Secretary to Conclude that the Health Care Industry's Experience with the LCC Reduced the Need for a Carry–Forward Provision.*

The Secretary did not act arbitrarily in concluding that the need for the carry-forward no longer justified its costs. The Secretary pointed out that health care providers by 1988 had significant experience adjusting the relationship between charges and costs. *Id.* at 10,081. That Medicare stood to save an estimated $130 million over five years as a result of the repeal did nothing to change this fact.[9] *See id.* at 10,084.

> *e. Elimination of the LCC Carry–Forward for New Providers Was Not Arbitrary.*

■ The plaintiffs' next challenge is that the repeal was particularly arbitrary and unfair for new providers. At a bare minimum, they contend, the Secretary should have preserved the carry-forward exception for new providers, who have high start-up costs, and who lack the experience helpful in dealing with the LCC limit. As the Secretary points out, however, new providers are not necessarily inexperienced with Medicare and medical costs and charges.[10]

---

**8.** In this impact analysis, the Secretary concluded that hospitals, Skilled Nursing Facilities, and Outpatient Physical Therapy Providers would not be significantly affected by elimination of the carry-forward, for reasons unique to each type of provider. 53 Fed. Reg. at 10,084. We discuss these reasons below, where we address the plaintiffs' contention that the repeal was particularly arbitrary for new providers.

**9.** We note that, while $130 million is a substantial sum of money, it is hardly a staggering amount when spread over five years and thousands and thousands of providers. Partly because of this reason, there is little force to the plaintiffs' contention that the projected savings resulting from the repeal indicate that providers did not have adequate experience managing the cost-charges relationship under the LCC.

**10.** Notably, the Medicare definition of "new provider" is premised upon the newness (three years or less) of operations as the particular *type* of facility that participates in Medicare, 42 C.F.R. § 413.13(a)(1999), so a single corporate entity, with a single building

Nor did the Secretary otherwise act arbitrarily in eliminating the LCC provision for new providers.[11] The Secretary concluded that hospitals, Skilled Nursing Facilities, and Outpatient Physical Therapy Providers would not be significantly affected by elimination of the carry-forward, for reasons unique to each type of provider: for hospitals, only outpatient services were covered by the LCC limit, and hospitals' size gave them unique ability to avoid LCC disallowances; Skilled Nursing Facilities had few LCC disallowances historically; and Outpatient Physical Therapy Providers historically suffered annual LCC disallowances, disqualifying them from reimbursement under the carry-forward provisions. 53 Fed. Reg. at 10,084. The Secretary therefore focused primarily on home health agencies ("HHAs") in assessing the impact of the repeal on new providers.

The Secretary concluded that: 1) with the steady growth of HHAs participating in Medicare during the ten years leading up to 1988, there was no longer a need to attract additional providers in an effort to increase patients' access to services, and thus a carry-forward was no longer necessary for that purpose;[12] 2) average capital-related costs for an HHA represent less than 3% of its total operating costs, so the carry-forward was not needed to protect against large capital start-up costs; 3) obtaining financing for start-up costs was no longer a significant obstacle to HHAs' entrance into the marketplace, because by the end of Fiscal Year 1985, 81.1% of new HHAs entering the Medicare program were either hospital-based or proprietary facilities which have access to alternative sources of financing, unlike the nonprofit HHAs that had previously dominated the industry; and 4) the nature of home health services permits HHAs to adopt flexible staffing and maintain minimal fixed assets, giving them more control over early-year costs than other types of providers and enabling them to align their costs with charges. *Id.* at 10,083–85. These considerations are more than sufficient to demonstrate the lack of arbitrariness in the Secretary's action.

It also did not render the repeal arbitrary for the Secretary to observe that new providers could simply charge more to defer the losses represented by the disallowed costs resulting from the repeal. *Id.* at 10,082. The Secretary considered the point that some new providers would experience losses resulting from disallowed costs, but noted that the losses that new providers incurred stemmed largely from their failure to establish charges at a level sufficient to cover costs from all patients, non-Medicare and Medicare.[13] *Id.* at 10,-

and a single veteran management staff, might be a "new provider" for LCC carry-forward purposes several times. Consequently, contrary to what the plaintiffs argue, the experience rationale may well have applied to a number of "new providers," who would have had considerable experience dealing with the LCC limit.

11. Although we do not dwell on this point, we note that the legislative history upon which the plaintiffs so heavily rely says nothing about new providers. This silence itself suggests that Congress was not particularly concerned about the Secretary implementing regulations to accommodate the special needs of

new providers. We also note that, because Congress did not mandate a carry-forward provision or other comparable relief, it is plausible that Congress recognized the possibility that all providers, including new providers, might not get the benefit of *any* carry-forward provision.

12. The number of HHAs had doubled from 1978 to 1986—from 2,500 to approximately 6,000. 53 Fed. Reg. at 10,084.

13. On a related note, the Secretary observed that the start-up costs for HHAs tend to be lower than for other health care providers,

082. Although the legislative history suggests that Congress did not intend that providers would set charges substantially higher than estimated costs, there is no suggestion that Congress did not want medical providers to raise charges to *meet* those costs.

### f. The Secretary Adequately Considered the Negative Impact that the Repeal Could Have on Medicare Beneficiaries.

█ There was nothing about the Secretary's rulemaking statement regarding Medicare recipients that would render the repeal arbitrary. The Secretary indicated that, as a general matter, the repeal would not cause Medicare recipients to seek other facilities. *See* 53 Fed. Reg. at 10,082. This point was supported by evidence in the record that most health care providers had considerable experience adjusting the relationship between costs and charges, that the repeal of the LCC would not significantly affect most health care providers, and that there was ample access to HHAs. *Id.* at 10,081, 10,083–84. The Secretary further indicated that in those instances in which a medical provider increased its charges, Medicare beneficiaries might seek health care services from other providers, who had not substantially increased their charges. *Id.* at 10,082. The Secretary did recognize that, in a limited number of cases, no suitable alternatives would be available to Medicare beneficiaries, but that in some of these cases, providers could possibly avoid increasing charges by reducing their costs. *Id.*

It is true that the Secretary acknowledged that some Medicare beneficiaries would possibly have to shoulder an additional financial burden as a result of the repeal of the carry-forward provision. *Id.* This acknowledgment did not render the Secretary's rulemaking statement or reliance upon it arbitrary, however. In the absence of a congressionally-imposed requirement, we must conclude that the Secretary had some flexibility to fashion a rule that would possibly affect some Medicare beneficiaries in an adverse manner.[14]

### Conclusion

The repeal of the LCC provision did not contravene a clearly expressed congressional mandate, nor was it based on an impermissible interpretation of the governing statute. The repeal was not otherwise arbitrary or capricious. The judgments of the district courts accordingly are

**AFFIRMED.**

PREGERSON, Circuit Judge, dissenting:

I agree with the majority that, under step one of *Chevron* analysis, courts are required to consider "traditional tools of statutory interpretation." *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. Thus, the majority correctly considers the legislative history when determining if Congress has clearly spoken on the issue of whether a carry-forward provision is required under the Medicare statute. 42 U.S.C. § 1395 *et seq.* I disagree, however, with the majority's and district court's conclusion that the repeal did not violate Congress' intent. I conclude that Congress expressed its clear

---

meaning that the absence of a carry-forward would generally not require new HHAs to increase costs greatly. 53 Fed. Reg. at 10,-084–85; 51 Fed. Reg. at 33,081– 82.

**14.** As the Secretary points out, the repeal may actually have *decreased* incentives to raise

charges. When a provider can no longer carry forward any unreimbursed costs, it has no incentive to increase charges in succeeding years in an attempt to set the reimbursement ceiling higher.

intent that the Medicare statute be implemented in a manner that avoids penalizing providers for short range discrepancies and does not create incentives for providers to set higher charges. The carry-forward provision satisfied these concerns and the regulation that repealed the carry-forward provision, without replacing it with another mechanism to respond adequately to Congress' concerns, violates Congress' clear intent, and thus is not entitled to deference. Accordingly, I respectfully dissent.

Step one of *Chevron* analysis begins with a consideration of the language of the statute itself, 42 U.S.C. § 1395f(b)(1). The statute in relevant part provides, "[t]he amount paid to any provider of services ... shall ... be ... the lesser of (A) the reasonable costs of such services, ... or (B) the customary charges with respect to such services." 42 U.S.C. § 1395f(b)-(b)(1). This language, adopted in 1972, implements the "lower costs or charges" ("LCC") principle. The statutory language does not address the question whether Congress intended for a carry-forward provision to apply.

Because the text of the statute is silent on this issue, courts next consider other manifestations of congressional intent, including the structure of the statute, the purpose of the statute, and legislative history to determine whether Congress clearly expressed an intent concerning adoption of a carry-forward (or similar) provision. In this case, all parties agree that the only other relevant manifestation of Congress' intent is the legislative history.

The majority cites the Senate and House Reports that accompanied the 1972 legislation. Although these reports raise serious concerns over the potential negative consequences of the implementation of the "lower costs or charges" principle, the majority ultimately concludes that this legislative history does not clearly express Congress' intent that the Secretary adopt provisions to respond to these concerns. I disagree. The report clearly identifies Congress' concerns with the LCC rule: that providers might be "penalized by such short-range discrepancies between costs and charges" and that there might be an "incentive for providers to set charges for the general public at a level substantially higher than estimated costs merely to avoid being penalized by this provision." H.R. Rep. No. 92–931, 92d Cong., 1st Sess. 102 (1971); S. Rep. No. 92–1230, 92d Cong., 2d Sess. 203 (1972). Thus, Congress "recognize[d] the desirability of permitting a provider ... to carry un-reimbursed allowable costs." *Id.*

This language evinces Congress' clear intent to avoid penalizing providers for short-range discrepancies between costs and charges and prevent creating incentives for providers to set charges higher to avoid being penalized by the LCC provision. Although Congress did not mandate that a carry-forward provision be adopted, the legislative history identifies two serious congressional concerns and proposes a solution: the adoption of a carry-forward provision.

The majority argues that Congress' expressed "desire" for the implementation of a carry-forward provision does "nothing more than reflect Congress' understanding that the LCC provision could have some unnecessarily harsh consequences, and that the Secretary would have discretion to temper these effects by permitting a carry-forward provision." This argument is undercut by the Secretary's remarks in the Federal Register. When the Secretary repealed the carry-forward provision in 1988, he published a response to the universal opposition expressed during the public comment period. *See* 53 Fed. Reg. at 10079–083. He initially noted that

among the new regulations, the elimination of the carry-forward provision was the sole change that did not "conform to the clear intent of the pertinent provisions" of the Social Security Act. 53 Fed. Reg. at 10079. He then noted, "while the LCC principle is mandated by sections 1814(b) and 1833(a)(2) of the Act, the specific inclusion of the carry-forward provisions in the regulations resulted solely from administrative discretion guided by *indicated Congressional intent."* *Id.* at 10080 (emphasis added). He then went on to explain that, in the Agency's view, developments after the passage of the Act indicated that the carry-forward provision was no longer necessary. *Id.* Thus, the Secretary himself asserted that the carry-forward provision was part of the agency's strategy to effectuate Congress' intent.

Even if I were to accept that Congress has not expressed a clear intent that the Secretary provide a carry-forward provision, I would conclude that the Secretary's interpretation does not pass step two of *Chevron* analysis because it is not a "permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. Congress unequivocally expressed its intent in the legislative history that the LCC provision neither penalize providers for short-range discrepancies between costs and charges nor create incentives for providers to set higher charges. Because the Secretary failed to adequately consider Congress' intent when he repealed the carry-forward provision, I conclude that his interpretation is impermissible.

The Secretary first argues that, after 14 years, providers should be used to the LCC and should have tightened their financial practices. The Secretary asserts (in his brief):

> [a]ccordingly, it was eminently rational for the Secretary to conclude in 1974 that an LCC carry-forward was needed

to give providers time to adjust their charge structures and tighten up their accounting practices. Presumably even Irvine would concede that 14 years elapsed from 1974 to 1988. It was, then, not irrational for the Secretary to conclude in 1988 that the health care provider industry had "long-term experience" in making the adjustments to its charge structures in response to establishment of the LCC limit.

This explanation, at best, supports an argument that the Secretary's decision to repeal the carry-forward was not irrational. The explanation does not refute the proposition that without a carry-forward provision—or some similar mechanism—providers will not be penalized for short range discrepancies. The appellants cite to the rich record of public comments describing the short-range discrepancy problem and refuting the Secretary's suggestion that "experience" with the LCC will avert the problem. *See, e.g., American College of Physicians, Letter to HCFA,* Nov. 17, 1986 ("We believe that the reasons which prompted formulation of the carry-forward provisions are as valid today as they were in 1968"). The Secretary fails to demonstrate that repealing the carry-forward provision—in the absence of another mechanism—is not contrary to the clear congressional intent to avoid penalizing providers for short term discrepancies.

Next, the Secretary argues that the repeal will not result in higher charges to the beneficiaries because: (1) providers could reduce costs, and (2) beneficiaries might select another provider. Contrary to these arguments, the Secretary conceded, in the Federal Register "comment and response" section, that beneficiaries would seek other facilities only "in a few instances," and that in cases where other facilities are not available, "the imposition of higher charges would result in a higher coinsurance

amount imposed on Medicaid beneficiaries." Fed. Reg. at 10082. The record contains the public comments of numerous organizations opposing the carry-forward repeal, in part, because it creates an incentive for providers to set higher charges. *See, e.g., Middle Tennessee Home Health Service letter to HCFA* (describing why elimination of the carry over provision will lead to increased charges to recipients and concluding "[w]e should not be trying to balance the budget on the backs of the elderly".). Thus, the Secretary's argument that the repeal of the carry-forward provision does not violate congressional intent by creating incentives for providers to raise charges is unpersuasive.

I conclude that Congress expressed a clear intent concerning the precise question at issue: whether the LCC provision should be implemented in a manner that did not penalize providers for short-range discrepancies or create incentives for providers to set higher charges. The Secretary's repeal of the carry-forward provision is contrary to this clear intent. Moreover, even accepting the majority's position that Congress has not clearly expressed such an intent, the Secretary's interpretation of the statute is contrary to the congressional directive evidenced in the legislative history and therefore impermissible. I decline to defer to the agency's interpretation of the Medicare statute in this instance and respectfully dissent.